**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN OSTEOPATHIC ASSOCIATION, AMERICAN COLLEGE OF OSTEOPATHIC INTERNISTS, INC., MARIA ASPRILLA, MATTHEW HARDEE, EMILY HURST, ERIN HUSTON, NANCY LAW, and SEGER MORRIS, *individually and on behalf of all others similarly situated*, | Case No. 25 CV 14691 <br><br> Honorable Sunil R. Harjani |
| Plaintiffs, | |
| v. | |
| AMERICAN BOARD OF INTERNAL MEDICINE and DOES 1-20, | |
| Defendant. | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case concerns a dispute between the organizations representing the DOs and the MDs. Defendant American Board of Internal Medicine historically provided board certification for internal medicine physicians who are Doctors of Medicine (commonly known as "MDs"). It recently implemented a policy that will only allow physicians to sit for its board certification exams if they have completed residency or fellowship training through its own Internal Medicine Board-certified program directors. Plaintiffs represent Doctors of Osteopathic Medicine (known as "DOs") and offer a competing Osteopathic board certification. They allege Defendant's policy allows it to restrict their access and increase its monopoly power in the board certification market for physicians and the labor market for internal medicine program directors. Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act. Defendant moves to dismiss all claims pursuant to Rule 12(b)(6) and for judgment on the pleadings under Rule 12(c).

This case exemplifies the classic attempt to force a square peg into a round hole. Plaintiffs' Complaint attempts to stretch these circumstances into antitrust theories that do not fit. The Court grants Defendant's motion to dismiss in part and denies it in part. Plaintiffs have not alleged plausible claims for an unlawful agreement to restrain trade (Count I) or a group boycott (Count III). They have also failed to allege that Defendant had an economic interest in an unwanted tied product to sustain their tying claim (Count II). But the monopoly cause of action aligns more closely with the allegations here. The Court denies Defendant's motion to dismiss that claim because the Osteopathic Board has sufficiently pled that the Internal Medicine Board enjoys monopoly power and has acquired and maintained that power through anticompetitive conduct (Count IV). The Court also denies Defendant's motion for judgment on the pleadings as premature because no answer has been filed and thus the pleadings are not closed.

**Background**

This case centers on the two primary competitors who offer board certification in internal medicine. Defendant American Board of Internal Medicine is the traditional certifying body for MDs, and Plaintiff American Osteopathic Association's board is generally the certifying body for DOs. [1] ¶¶ 42–43.[1] However, since 2015, both MD and DO internal medicine physicians have gained board certification through either organization after completing a residency or fellowship. *Id*. ¶ 48.

Before residents and fellows may sit for the board certification exams, they must have the hospital program director who led their training program attest to their program completion. *Id*. ¶ 51. Before 2024 (or 2025 for one subspecialty), attestations from all program directors satisfied both the Internal Medicine and Osteopathic Boards' requirements. *Id*. ¶¶ 43, 51, 61. It was irrelevant if the program director was certified by the Internal Medicine Board or the Osteopathic Board. *Id*. ¶¶ 51, 60–61.

Defendant has changed its attestation policy. *Id*. ¶ 60. Now only program directors certified by its own Internal Medicine Board can attest to a resident's or fellow's program completion if they want to take Defendant's board certification exam. *Id*. ¶ 5. Attestations from Osteopathic-certified program directors no longer satisfy Defendant's requirements. *Id*. Plaintiff American Osteopathic Association's board, on the other hand, still accepts attestations from program directors certified by either board. *Id*. ¶ 76.

The problem for Plaintiffs is that residents and fellows want to take Defendant's board certification exams, and hospital programs want to attract those trainees. The Internal Medicine Board certification is the dominant credential in the field of internal medicine. *Id*. ¶ 66. Over 95% of internal medicine physicians receive board certification through the Internal Medicine Board. *Id*. ¶ 47. Further, physicians who are MD-trained are naturally inclined to seek Internal Medicine Board certification. *Id*. ¶ 65. So, if a hospital program wants its residents and fellows to have the opportunity to sit for Defendant's exams, it must have an Internal Medicine Board-certified program director. *Id*. ¶ 66–67.

To ensure residents and fellows can take the Internal Medicine Board exams, hospitals have pressured their Osteopathic-certified program directors to step down or become Internal Medicine Board certified themselves. *Id*. ¶¶ 65–67. This is allegedly what happened to Plaintiffs Asprilla, Hardee, Hurst, Huston, Law, and Morris, who are Osteopathic-certified physicians serving as hospital program directors when Defendant's policy came into effect. *Id*. ¶¶ 14–19. They have either lost their titles and jobs or spent significant time and money preparing for Internal Medicine Board certification exams to retain their positions. *Id*. ¶¶ 98–112.

---

[1] For the purposes of reviewing this motion to dismiss under Rule 12(b)(6) and motion for judgment on the pleadings under Rule 12(c), the Court accepts as true all factual allegations in the Complaint. *Heredia v. Cap. Mgmt. Servs, L.P.*, 942 F.3d 811, 814 (7th Cir. 2019); *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). The Court notes that Plaintiffs' Complaint is sprawling and convoluted, and has made it unnecessarily difficult for the Court to identify the pertinent facts.

Plaintiffs American Osteopathic Association and American College of Osteopathic Internists[2] are also allegedly harmed by this attestation requirement because it makes Osteopathic board certification less desirable. *Id.* ¶¶ 115–119. Program director roles are valuable positions and often lead to other, desired opportunities in hospital administration and medical education. *Id.* ¶¶ 55–56. So, according to Plaintiffs, any physician who wants to become a program director will seek Internal Medicine Board certification rather than Osteopathic board certification to remain a competitive candidate. *Id.* ¶ 78. And because hospital training programs are now overwhelmingly led by Internal Medicine Board-certified program directors, residents and fellows are less likely to be aware of and prepared for Osteopathic board certification. *Id.* ¶ 96.

Plaintiffs claim Defendant's attestation requirement is anticompetitive and has no justification. According to Plaintiffs, Defendant[3] is allegedly using the attestation requirement to squeeze the American Osteopathic Association out of the board certification market by diminishing its pipeline of certification candidates. *Id.* ¶¶ 64, 117, 119. In short, the attestation requirement purportedly reduces competition for prized program director roles, clearing the way for Internal Medicine Board-certified physicians to secure those valuable positions. *Id.* ¶¶ 64, 77.

### Legal Standard

Defendant moves to dismiss all claims under Federal Rules of Civil Procedure 12(b)(6) and 12(c). A motion for judgment on the pleadings under Rule 12(c) is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). On a Rule 12(b)(6) motion, the court reviews the complaint for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 728. When reviewing the complaint, the Court construes it in the light most favorable to plaintiff, accepts well-pleaded facts as true, and draws all inferences in plaintiff's favor. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016).

### Discussion

Plaintiffs bring three claims under Section 1 of the Sherman Act, 15 U.S.C. § 1. They argue that Defendant's attestation policy is an agreement to unlawfully restrain trade, impermissible tying, and creates a group boycott of Osteopathic-certified internal medicine program directors. Plaintiffs also claim monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2. In addition to denying these allegations,

---

[2] Plaintiff American College of Osteopathic Internists is a professional organization of osteopathic physicians who specialize in internal medicine. [1] ¶ 13.

[3] Though Plaintiffs name the American Board of Internal Medicine and Does 1-20 as defendants, this memorandum opinion and order refers to Defendant American Board of Internal Medicine only as the other defendants are not identified by name.

Defendant also challenges Plaintiffs' standing to bring these claims and the plausibility of each of them.

## I. Article III Standing

As an initial matter, Defendant argues that Plaintiffs lack Article III standing to bring their antitrust claims for two reasons.[4] First, the Osteopathic organizations and physicians supposedly cannot trace their injuries to Defendant's attestation requirement. According to Defendant, the alleged injury stems from hospitals that choose the Internal Medicine Board program directors. Similarly, physicians, not Defendant, are causing the decline in Osteopathic board certification because they select Internal Medicine Board certification. Second, because of these independent intermediaries, Defendant claims Plaintiffs' injuries are unlikely to be redressed by a favorable judicial outcome, as it is speculative to assume that hospital programs will hire Osteopathic-certified program directors. Defendant further argues that a favorable decision will not convince more candidates to take the Osteopathic board certification exams.

To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the motion to dismiss stage, Plaintiffs need only plausibly allege that standing exists, and the Court accepts all allegations as true and construes the complaint in the light most favorable to them. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

### A. Injury in Fact

Plaintiffs plausibly allege the first standing requirement, an injury in fact. Plaintiffs American Osteopathic Association and American College of Osteopathic Internists claim financial harm from the loss of exam, membership, and programming fees. [1] ¶¶ 117–119. Such financial harm is an injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The other individual Plaintiffs also suffered an injury in fact because they lost their supposedly valuable positions as program directors or needed to pay for the costs of the Internal Medicine Board certification. *See Am. Fed'n of Gov't Emps., Local 2119 v. Cohen*, 171 F.3d 460, 466 (7th Cir. 1999).

### B. Traceability

Turning to the second requirement, Plaintiffs must show "a causal connection between the injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That is, the injury suffered must be fairly traceable to the defendant's actions. *Id*. Article III standing inquiry does not require proximate causation but rather a meaningful connection between the defendant's conduct and the plaintiff's injury. *Pit Row, Inc. v. Costco Wholesale Corp*., 101

---

[4] The Court construes Defendant's attack on Plaintiffs' constitutional standing as a motion to dismiss under 12(b)(1) for lack of subject-matter jurisdiction. In any event, the Court has its own obligation to ensure that Plaintiffs have subject matter jurisdiction. *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 890 (7th Cir. 2013).

F.4th 493, 502 (7th Cir. 2024). But standing is more difficult to establish if a third party directly causes the injury. *California v. Texas*, 593 U.S. 659, 675 (2021). In those circumstances, plaintiffs must plausibly allege that "third parties will likely react in predictable ways" to ensure the theory of standing "does not rest on mere speculation about the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Plaintiffs have met this threshold. They allege that, to remain attractive to potential candidates, hospitals are compelled to maintain a residency or fellowship program that would allow candidates to be eligible for Internal Medicine Board certification. [1] ¶¶ 58, 65–66. Because of Defendant's attestation requirement, hospital programs must hire Internal Medicine Board-certified program directors if their residents and fellows want to sit for the Internal Medicine Board certification exam. *Id*. ¶ 5. As a result, hospital programs exert "substantial pressure on their [Osteopathic-certified] program directors to either obtain [Internal Medicine Board] certification(s) or to step down in favor of someone who is [Internal Medicine Board]-certified." *Id*. ¶ 67. Similarly, Plaintiffs allege that physicians are more likely to seek Internal Medicine Board certification if program directors certified by the Internal Medicine Board train them. *Id*. ¶ 96. These physicians are less likely to be familiar with the Osteopathic board exams or prepared for them. *Id*. And ultimately, according to the Complaint, physicians need Internal Medicine Board certification if they aspire to become a program director in the future. *Id*. ¶ 78. All of this alleged conduct, despite being through the third-party hospitals, can be fairly traced to Defendant's policy.

The Osteopathic physicians also pled specific examples to indicate that their injuries are fairly traceable to Defendant's conduct. For example, Plaintiff Asprilla was "demote[d] to Assistant Program Director, and another physician who is board certified [by the Internal Medicine Board] stepped into the role of Program Director" to provide the required attestations. *Id*. ¶ 101. Likewise, Dr. Hurst's employer "presented [her] with two options: obtain board certification from [the Internal Medicine Board] or resign as Program Director" because she could not attest to her residents' training. *Id*. ¶ 103. Plaintiff Hardee was also purportedly injured when his hospital program "required" him to obtain Internal Medicine Board certification. *Id*. ¶ 109. These hospitals reacted in predictable ways in response to the attestation requirement. And, according to the Complaint, the attestation requirement is the only reason these Osteopathic program directors have lost their positions or needed to take additional certification exams.

### C. Redressability

The third standing element considers whether Plaintiffs' injury is redressable by a favorable judicial decision. *Lujan*, 504 U.S. at 561. To meet the redressability requirement, Plaintiffs only need to plead "that there is a substantial likelihood that the relief requested will redress the injury claimed." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 501 (7th Cir. 2005). Plaintiffs must plead more than simply speculation that the requested judicial relief will redress their injuries. *Lujan*, 504 U.S. at 561.

The Osteopathic organizations and physicians request an injunction requiring the Internal Medicine Board to allow all residency and fellowship program directors to attest to program completion so their candidates may sit for the Internal Medicine Board certification exams. [1] ¶ B. The Court finds that it is sufficiently plausible, and not just speculative, that Plaintiffs' injuries would be redressed through the requested injunction. Based on the pleadings, it is sufficiently

5

likely that, if the attestation policy is unenforceable, Osteopathic-certified program directors would retain their positions or otherwise be hired. *Id.* ¶ 102. According to the Complaint, other Osteopathic physicians would no longer be burdened by the need to test for and maintain Internal Medicine Board certification to be considered for program director roles. *Id.* ¶ 109. Plaintiffs also allege that more residents and fellows will be aware of Osteopathic certification if trained by Osteopathic-certified program directors. *Id.* ¶ 96. This increases the possibility that more physicians will take the Osteopathic exams. Additionally, without the attestation policy, physicians would not see Osteopathic certification as a barrier to their career goals. *Id.* ¶ 95. Thus, the Complaint's allegations make it plausible that hospitals and physicians would choose Osteopathic certification and Osteopathic-certified program directors if the attestation policy were not enforceable.

As a result, the Court finds that Plaintiffs have Article III standing at the motion-to-dismiss stage. However, Plaintiffs will need to support these causal connections with specific facts to maintain standing at summary judgment. *Lujan*, 504 U.S. at 561.

## II.   Antitrust Standing and Antitrust Injury

In addition to Article III standing, plaintiffs asserting antitrust claims must be "the proper party to bring a private antitrust action." *Loeb Indus. Inc., v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002). Not everyone affected by an antitrust violation may recover under the antitrust laws. *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006). Instead, Plaintiffs must suffer an antitrust injury and demonstrate their injuries are "of the type the antitrust laws were intended to prevent." *Id.* The Osteopathic organizations and physicians must also establish that they can "most efficiently vindicate the purposes of the antitrust laws" to have antitrust standing. *Id.* Defendant contends Plaintiffs lack both.

First, Defendant argues that Plaintiffs have not pled an injury to competition in the market, which is the kind of injury antitrust laws seek to redress. Customers and competitors in the affected market suffer an antitrust injury because their harm is attributable to the alleged antitrust violation. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.*, 937 F.3d 1056, 1065 (7th Cir. 2019). Further, competitors suffer an antitrust injury when they are excluded from the market because of defendant's conduct. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020). Here, Plaintiffs are direct competitors in the market. Plaintiffs American Osteopathic Association and American College of Osteopathic Internists are competing for market share among internal medicine physicians seeking board certification. [1] ¶ 51. The individual Plaintiffs are physicians competing for positions as program directors with physicians who have Internal Medicine Board certification. *Id.* ¶ 77. As competitors, the Osteopathic organizations and physicians are excluded from the market because of the Internal Medicine Board's attestation policy. According to the Complaint, the Osteopathic organizations have lost a pipeline of candidates who were taking the Osteopathic board certification exams and paying the associated fees. *Id.* ¶¶ 115–119. The individual Plaintiffs have been forced out of competing for program director roles because hospitals need Internal Medicine Board-certified program directors. *Id.* ¶¶ 64–67. As a result, they have left their program director positions or have become certified by the Internal Medicine Board. *Id.* ¶ 97. These allegations sufficiently plead antitrust injuries.

Second, Defendant argues Plaintiffs' injuries are too remote from the attestation policy to confer antitrust standing because third-party hospitals decide who to hire for program director roles, and third-party physicians choose which board certification to pursue. "The general rule is that customers and competitors in the affected market have antitrust standing." *Viamedia*, 951 F.3d at 482. As discussed above, the Osteopathic organizations and physicians are competitors in the relevant markets of internal medicine board certification and the labor market for program directors. Further, they have sufficiently pled that the attestation policy has harmed competition in those markets to demonstrate antitrust injury. Despite the intermediary hospitals and physicians, Plaintiffs have alleged facts showing a direct link between their injuries and the market harm. According to the Complaint, the hospitals' hiring choices were plausibly foreseeable given the Internal Medicine Board's requirement, and the attestation policy constrains physicians' choice for certification. Thus, based on the allegations, it is reasonably plausible that the hospitals and physicians are not independent actors sufficient to break the chain of causation between the attestation policy and Plaintiffs' harms. At this pleading stage, the Osteopathic organizations and physicians have sufficiently alleged that their injuries were "inextricably intertwined with the injury [Defendant] sought to inflict," namely, its alleged dominance of the internal medicine certification market and capture of program director roles for its certified physicians. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).

Accepting the Complaint's allegations as true and drawing reasonable inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged injury to the market to constitute an antitrust injury and a sufficiently direct connection between their injuries and the attestation requirement to establish antitrust standing.

### III.    Section 1 Claims

Plaintiffs bring three Section 1 claims. Count I alleges an agreement to restrain trade between Defendant and Internal Medicine Board-certified physicians. Count II claims Defendant unlawfully tied its board certification to training under an Internal Medicine Board-certified program director. Count III alleges that Defendant coerced hospital training programs into boycotting Osteopathic-certified program directors.

### A.  Agreement to Restrain Trade

In Count I, Plaintiffs assert that the Internal Medicine Board, its board members, and Internal Medicine Board-certified physicians conspired to adopt and enforce the attestation policy. They argue that this policy restrains competition from Osteopathic-certified physicians, allowing Internal Medicine Board-certified physicians to capture program director roles. In moving to dismiss, Defendant counters that Plaintiffs have not alleged an agreement necessary for a Section 1 claim. More specifically, Defendant argues that the Internal Medicine Board cannot conspire with its own members and thus adopting and enforcing the attestation agreement is a unilateral action by a single entity.

To support a claim under Section 1 of the Sherman Act, plaintiffs must plausibly allege a "contract, combination, or conspiracy," or in other words, an agreement. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). But a single entity implementing its own policy is unilateral action, and not an agreement for antitrust purposes. *Copperweld Corp. v. Indep. Tube*

*Corp.*, 467 U.S. 752, 769 (1984). Generally, an organization cannot be said to agree or conspire with itself, including its board members or employees, because it is a unified economic actor. *Id*.; *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 264 (7th Cir. 1984). Outside the antitrust context, the Seventh Circuit has also affirmed that members of the same entity cannot form a conspiracy when acting in the entity's interest. *Beese v. Todd*, 35 F. App'x 241, 243 (7th Cir. 2002); *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994). However, if members of one entity are otherwise independent decision-makers and are acting on their own behalf, they may be able to form a conspiracy. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 200 (2010).

Here, Plaintiffs have not sufficiently pled an agreement. To start, Plaintiffs only name the American Board of Internal Medicine as a Defendant. The other 20 Does are unnamed "persons, firms, and corporations" who somehow aided the conspiracy, but their role is unknown. [1] ¶ 22. The Complaint discusses, but does not name, prior and current Internal Medicine Board chairs and alleges that they are practicing physicians. *Id*. ¶¶ 23–27. Plaintiffs also allege that other Internal Medicine Board members and certified physicians compete for program director positions. *Id*. ¶¶ 28, 89.

This is the extent of Plaintiffs' facts about the alleged co-conspirators, and it is inadequate for two reasons. First, Plaintiffs make no allegations about the independent interests and motivations of the current and former board chairs or board members. There are insufficient allegations about the purportedly separate actors to show that the Internal Medicine Board and board members are acting independently to adopt and enforce the attestation requirement. Thus, the Court cannot infer that they were independent decision-makers. Second, Plaintiffs' allegations about Internal Medicine Board-certified physicians are conclusory. The Osteopathic organizations and physicians provide no detail about which of the over 215,000 Internal Medicine Board-credentialed physicians could have been involved in an alleged conspiracy. They similarly do not allege what any physicians did to further the conspiracy, or when and how they joined the conspiracy. Plaintiffs' "conclusory allegation of an agreement at some unidentified point" does not suffice. *Twombly*, 550 U.S. at 557.

Because Plaintiffs have not sufficiently pled an agreement to support their claim of an unlawful restraint on trade, Defendant's motion to dismiss is granted on Count I.

### B. Unlawful Tying Arrangement

Plaintiffs' next claim alleges that Defendant tied the Internal Medicine Board certification to residency training under an Internal Medicine Board-certified program director. This supposedly compels residents and fellows to "purchase" certain hospital training programs if they wish to sit for the Internal Medicine Board certification exams.[5]

---

[5] The Court questions whether these are two distinct products that can be tied together, which is the first requirement of a tying claim. *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022). However, Defendant did not raise the argument, so the Court opts not to dive into this inquiry.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer purchase a different (or tied) product." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 573 (7th Cir. 2022). Ties can be acceptable forms of competition, so a tie only violates antitrust law when the seller forces the buyer to purchase a second tied product, thereby eliminating competition on the merits for the tied product. *Id*. Plaintiffs must plead four elements to state a claim for an unlawful tie: 1) a tie between two separate products; 2) that the seller's economic power in the tying market allows it to restrain competition in the tied market; 3) that the tie effects a not insubstantial amount of interstate commerce; and 4) that the seller has an economic interest in the sales of the tied product. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316–17 (7th Cir. 2006).

### 1. Agreement to Purchase an Unwanted Product

Defendant first contends that Plaintiffs have not shown an agreement for this Section 1 claim. It argues that there are no allegations that Defendant colluded with the hospital training programs to tie Internal Medicine Board certification to a product unwanted by physicians. Plaintiffs dispute that allegations of collusion are required for a tying claim. They argue that conditioning the sale of the tying product on the purchase of the tied product creates an agreement for their tying claim.

The agreement for a Section 1 tying claim is satisfied when the purchaser takes the tied product on the seller's conditions. *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 670 (7th Cir. 1985). "The 'contract, combination, or conspiracy' that triggers § 1 is obviously present when the buyer promises to take its requirements of the second product from a supplier as an express quid pro quo for being allowed to buy the tying product." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1700i (2026); *see Eastman Kodak Co., v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992) (defendant's alleged sale of product on the condition buyer purchase second product is not a unilateral conduct); *Systemcare, Inc. v. Wang Lab'ys Corp.*, 117 F.3d 1137, 1142–43 (10th Cir. 1997) (the contract, combination, or conspiracy in a tying claim is the agreement to take the tied product). Here, the Osteopathic organizations and physicians allege that residents and fellows "will not consider a program that limits their eligibility to sit for the [Internal Medicine Board] examination," so they seek training programs led by program directors with Internal Medicine Board certification to ensure access to the certification exams. [1] ¶¶ 46–47. Without this tie, Plaintiffs allege, "physicians regularly choose the provider of their medical specialty training independent of the board certification that they will ultimately seek." *Id*. ¶ 138. So, according to Plaintiffs, the Internal Medicine Board has conditioned choosing the tying product (the board certification exams) on selecting the tied product (training under an Internal Medicine Board-certified program director), and physicians take that training on Defendant's terms. This is sufficient to plausibly allege the "agreement" element of Plaintiffs' tying claim.

However, there is a second, more persuasive point in Defendant's argument. The Internal Medicine Board also disputes that the tied product is "unwanted by physicians." "A tie within the meaning of antitrust depends on showing that the buyer did *not* want to take both products from the same provider." *Will*, 776 F.2d at 669. Again, the tie is only unlawful if defendants force the buyer to take the second product. *Siva*, 38 F.4th at 573.

While Plaintiffs allege that residents and fellows would select "specialty medical training from [Osteopathic]-certified physicians" unrelated to board certification from the Internal Medicine Board, [1] ¶ 138, they do not allege that residents and fellows do not desire medical training under Internal Medicine Board-certified program directors. Certain facts in the Complaint also undermine this inference. For example, the Osteopathic organizations and physicians allege that "95% of all board-certified internists are credentialed" by the Internal Medicine Board and that the Internal Medicine Board "has an established brand that many [MD] trained physicians prefer." *Id*. ¶ 47. They further state that in 2024, 81% of residency applicants were MDs and thus "predisposed to seek board certification from the [Internal Medicine Board] as the historically [MD] specialty certifying board." *Id*. ¶ 65. From these allegations, it is implausible to infer that these MD-trained residents and fellows do not want further training under Internal Medicine Board-certified program directors.[6]

While Plaintiffs have sufficiently pled the "agreement" required for a Section 1 tying claim, they have not sufficiently alleged that the training from Internal Medicine Board-certified program directors is unwanted.

### 2. Separate Economic Interest

Defendant also disputes that Plaintiffs have plausibly alleged the economic interest in physicians choosing Internal Medicine Board-led residencies or fellowships. It argues that hospitals administer the training programs, and that Defendant does not receive any financial compensation when residents and fellows train under Internal Medicine Board-certified program directors. Plaintiffs respond that the economic benefit need not be monetary to sustain a tying claim.

For a tying claim, the Seventh Circuit requires that the seller has an economic interest in the second product. *Carl Sandburg Vill. Condo. Ass'n No. 1. v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985). This indicates the seller is using its power in the first product market to invade the second market of the tied product. *Id*. at 208. This is easily met where the seller distributes both products. *Id*. But where a third party sells the tied product, the defendant must still have some indirect economic interest. *Id*.; *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978). Overall, increased sales and efficiency from selling both products together are insufficient to establish a separate economic interest in the tied product market. *Carl Sandburg*, 758 F.2d at 209.

To establish this element, Plaintiffs allege that Defendant benefits from the "sale" of residency and fellowship training under Internal Medicine Board-certified program directors because it can promote its board certification and brand, and also enhance its stature through capturing highly-visible program director positions. [1] ¶ 141. This increases the Internal Medicine Board's power in the board certification market and promotes its continuing education programs. *Id*. But Defendant's alleged economic interest must be in the second product, rather than the first

---

[6] Plaintiffs have alleged facts to suggest that certain hospital programs do not want to lose their Osteopathic-certified program directors because they sought an exemption from the attestation requirement. *E.g.*, [1] ¶¶ 100, 101 (The Complaint includes two paragraphs numbered 100. For the avoidance of doubt, the Court refers to ¶ 100 on page 41). But the hospital programs are not the purchasers for the alleged tying claim.

product or the combined package. Recall that the Internal Medicine Board does not sell the training programs—the hospitals do. So, promoting board certification is about selling the first product—the certification exams. And the continuing education products are linked to the board certification, not the training programs, because "all board-certified internists are also required to complete continuing medical education ('CME') and are subject to periodic examinations to retain active board certification status." *Id*. ¶ 54.[7]

There are no facts suggesting that the Internal Medicine Board receives any monetary compensation or financial benefit when residents and fellows choose training under one of its credentialed program directors. So, all that is left are allegations that enhancing the Internal Medicine Board's brand and capturing visible program director roles constitute possible economic benefits from the tied product. Seventh Circuit case law does not specifically address whether the separate economic interest must be financial. However, they have found that rebates and commissions are clear monetary benefits that suffice for this element of the tying claim. *Carl Sandburg*, 758 F.2d at 208 (defendant can receive an indirect economic benefit through a commission or rebate); *Ohio-Sealy Mattress Mfg. Co.*, 585 F.2d at 835 (defendant received substantial rebates from tied product sold by third party).

Other circuits that impose this element appear to require a monetary benefit to establish a defendant's separate economic interest in the tied product. In *Thompson v. Metropolitan Multi-List, Inc.*, the Eleventh Circuit found a sufficient separate economic interest where defendant received financial support indirectly from the sale of the tied product. 934 F.2d 1566, 1579 (11th Cir. 1991). Defendant, the local branch of a national organization, did not directly benefit from forcing plaintiff to purchase a membership in the organization because plaintiff needed to join a different local branch. *Id*. But the local branches each paid the national and state-wide organizations. *Id*. The national and state-wide organizations, in turn, used that money to aid local branches. *Id*. Though quite indirect, the court could not say that defendant had "absolutely no interest" in plaintiff's purchase because it received indirect financial support generated through plaintiff's membership. *Id*. Another case on summary judgment found arguments about "capturing business" to be too attenuated to constitute a separate economic benefit. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001). In *County of Tuolumne*, plaintiff alleged that the hospital defendant tied its hospital obstetrical services to C-sections performed by specific obstetricians. *Id*. at 1157. The hospital defendant did not receive fees or profits from these obstetricians. *Id*. at 1158. Instead, plaintiff claimed the hospital benefited indirectly from the obstetricians' C-sections because it "captured the pediatric business referred by" the obstetricians. The Ninth Circuit found that there were other reasons why the defendant hospital attracted patients seeking obstetrical services. *Id*. And the "capturing business" indirect economic benefit was too attenuated to create a genuine issue of material fact on the economic interest element of a tying claim. *Id*.

---

[7] In support of finding a separate economic benefit, Plaintiffs also point out the "thousands of dollars in testing and maintenance fees" that Plaintiffs Hardee and Huston have paid to obtain and upkeep their Internal Medicine Board certification. [40] at 18. But that is not a benefit from residents and fellows "purchasing" training from the hospitals. It is a benefit from physicians purchasing the Internal Medicine Board certification and then maintaining it.

In response, Plaintiffs point to *Tiz, Inc. v. Southern Glazer's Wine and Spirits, LLC* to suggest a nonmonetary economic benefit in the tied product satisfies this element. In that case, plaintiff, an online alcohol ordering platform, alleged that an alcohol distributor received the economic benefit of e-commerce data when retailers use the tied product, the distributor's own free online ordering platform. *Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *22 (N.D. Ill. May 30, 2024). The online platform had also alleged that the data "carrie[d] its own independent, economic value" and that the distributor and others competed for that retailer data. *Id.* at *23. Accordingly, the online platform had sufficiently pled that the distributor derived a separate, economic interest from use of the tied product in the second market. *Id.*

Plaintiffs' argument is unpersuasive. First, the e-commerce data in *Tiz* are dissimilar from the Osteopathic organizations and physicians' allegations of an economic benefit from enhancing brand and visibility in this case. "In an Information Age, data can be worth more than money." *Gardner v. Me-TV Nat'l Ltd. P'Ship*, 132 F.4th 1022, 1024 (7th Cir. 2025). Data can be packaged and sold to third parties, and, as the court pointed out in *Tiz*, it was desired in the second market. *Tiz*, 2024 WL 2785142, at *23 (N.D. Ill. May 30, 2024). Second, while brand power and visibility might, theoretically, constitute an economic interest, Plaintiffs' allegations are conclusory. The Osteopathic organizations and physicians have not alleged the value or benefit of the Internal Medicine Board's purported brand power and visibility in program director roles. There are no facts in the Complaint that allow this Court to evaluate whether the brand power and visibility can be translated into an economic interest or have some financial value. Plaintiffs must plausibly allege facts about why this benefit of increased brand power and visibility is economically meaningful to the Internal Medicine Board, and they cannot rest on only conclusory statements. *Iqbal*, 556 U.S. at 678.

To recap, Plaintiffs have pled an agreement to support their tying claim, but there are insufficient facts to find that the tied product is unwanted. They similarly fail to plausibly demonstrate that Defendant derives a separate economic benefit from residents and fellows training under Internal Medicine Board-certified program directors. Defendant's motion to dismiss is granted as to Count II.

### C. Group Boycott

Plaintiffs' final Section 1 claim alleges that the Internal Medicine Board coerced hospital programs into boycotting Osteopathic-credentialed program directors through the attestation requirement. Defendant once again argues that Plaintiffs have not alleged any agreement between the Internal Medicine Board and hospitals to join this boycott. It contends that hospitals may freely choose whether to adhere to the attestation requirement and prepare candidates for Internal Medicine Board certification. Plaintiffs respond that the hospitals were coerced into joining the unlawful boycott, and this creates an "agreement" to support their Section 1 claim.

Unwilling participants may still join a conspiracy or form an agreement for a Section 1 antitrust claim. *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 973–94 (7th Cir. 1995). Cases supporting such a "coercion" theory of agreement to boycott, however, involve communications that exert pressure, beyond simply establishing a unilateral policy. Consider *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967 (7th Cir. 1995). In that

case, the defendants were coerced through threats of labor disruptions and property damage if they contracted with other forklift and heavy machinery providers. *Id*. at 971. The court found that by acquiescing to the demands, defendants joined the conspiracy. *Id*. at 975. Similarly, in *Hytera Communications Corporation*, the district court found a sufficiently pled conspiracy where defendant sent threatening statements and letters to dealers, coercing them to stop dealing with the plaintiff. *Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 882 (N.D. Ill. 2022). Though not within the group boycott theory, the Seventh Circuit in *Isaksen v. Vermont Castings, Inc.*, also found that an agreement could be formed through coercion. 825 F.2d 1158, 1163 (7th Cir. 1987). But in that case, too, plaintiff's "agreement [was] procured by threats." *Id*. The appellate court explained that an unwilling party may form an agreement for Section 1 liability, but the defendant must have induced the involuntary participant "by conduct that went beyond merely announcing a policy" of conditions for future dealing. *Id*. Even in *Tiz*, which Plaintiffs cite to support their coercion theory, the defendant had additional, repeated contact with retailers to seek their agreement to stop using plaintiff's online marketplace. 2024 WL 2785142, at *21 (N.D. Ill. May 30, 2024). The retailers were allegedly unwilling to use defendant's online ordering tool, but acquiesced to defendant's demands, sufficiently showing an agreement. *Id*.

In stark contrast to *MCM Partners, Hytera*, *Isaksen,* and *Tiz*, Plaintiffs here lack allegations that the Internal Medicine Board threatened, pressured, or even sought the hospitals' agreement to boycott Osteopathic-certified program directors. Indeed, Plaintiffs fail to allege that Defendant had any contact with hospital programs to seek their agreement. Taking their best shot, the Osteopathic organizations and physicians argue that the policy "all but compels" hospitals to hire Internal Medicine Board-certified program directors, [1] ¶ 65, and that the hospitals have "lost autonomy" to select the program directors of their choice because they want to ensure their residents and fellows can sit for the Internal Medicine Board certification exams. *Id*. ¶ 71. But they have not alleged that it was the Internal Medicine Board that took any action to seek this compliance—the choice here was made by the hospitals and, according to the Complaint, apparently without coercion.

Plaintiffs have not alleged that Defendant communicated, pressured, coerced, or threatened the hospital programs beyond reinstating the attestation requirement. Absent such allegations, the Court cannot conclude that the hospitals plausibly agreed to join the group boycott. Defendant's motion to dismiss as to Count III is granted.

### D. Rule of Reason

Finally, Defendant disputes that Plaintiffs have demonstrated the second element of their Section 1 claims—an unlawful restraint on trade. More specifically, Defendant argues that the Complaint does not state a claim under the rule of reason framework.

Courts use three methods for analyzing whether a restraint is unreasonable: per se, quick look, and the rule of reason frameworks. *Agnew*, 683 F.3d at 335. The rule of reason analysis is the standard framework for evaluating potential anticompetitive effects. *Id*. Plaintiffs do not dispute that the rule of reason is the appropriate method for analyzing their claims. [40] at 18. Under the rule of reason framework, plaintiffs must first establish the defendant's market power. *Agnew*, 683 F.3d at 335. Defendant may counter with a procompetitive rationale for the alleged

13

restraint. *Id*. The burden then shifts back to plaintiffs to show the conduct is not reasonably necessary to accomplish the procompetitive goal. *Id*.

But the Court does not need to reach this analysis. As discussed above, the Osteopathic organizations and physicians have not plausibly alleged an agreement to support their restraint of trade and group boycott claims. They also fail to show that Defendant has an economic interest in physicians choosing training from Internal Medicine Board-certified program directors, or that such training is undesired. Since the first element of a Section 1 claim has not been plausibly alleged, Defendant's argument about the rule of reason is moot.

IV.    **Section 2 Illegal Monopolization**

Plaintiffs' final claim is brought under Section 2 of the Sherman Act.[8] Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. Plaintiffs allege the Internal Medicine Board abused its monopoly power in the board certification market to suppress competition from Plaintiff American Osteopathic Association and Osteopathic-certified physicians.

Possessing monopoly power itself is not a violation of Section 2. That monopoly power must be abused or improperly obtained to fall within the ambit of an antitrust violation. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Thus, Plaintiffs must demonstrate that Defendant both "possesses monopoly power in the relevant market" and "engages in the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Viamedia*, 951 F.3d at 451. Defendant argues Plaintiffs have not plausibly alleged either element.

**A. Monopoly Power**

Monopoly power is the ability to exclude competition or control prices. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). It can be shown through direct evidence of anticompetitive effects or indirectly through market share. *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000).

Plaintiffs allege direct evidence of anticompetitive effects. They state that the number of Osteopathic program directors in hospitals has dropped by 93%, primarily due to the attestation requirement. [1] ¶ 67. According to the Complaint, residents and fellows are not taking the Osteopathic board exam because it hinders their career options, and there is no benefit from maintaining both certifications. *Id*. ¶¶ 78–79, 117. Physicians are also allegedly dropping their Osteopathic certification in favor of seeking and maintaining Internal Medicine Board certification. *Id*. ¶ 117. This threatens the American Osteopathic Association's and American College of Osteopathic Internists' revenue and membership pipeline. *Id*. ¶¶ 117, 119. These

---

[8] Plaintiffs style Count IV as one for monopolization, attempt to monopolize, and conspiracy to monopolize. Because the parties only discussed the elements for monopolization in their briefs, the Court does not analyze the elements of an attempt to monopolize or conspiracy to monopolize claim.

allegations are sufficient to establish that the Osteopathic organizations are being excluded from the marketplace. In effect, the attestation policy is eliminating the Internal Medicine Board's competition from the market for internal medicine board certification. For these reasons, the Court finds that Plaintiffs have sufficiently pled anticompetitive effects because Defendant has excluded them from competition on the merits.

But there is more. Plaintiffs allege indirect evidence, too. Monopoly power may be inferred from a predominant market share. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). According to the Complaint, Defendant has an overwhelming market share: 95% of all internists and 97% of recently credentialed internists hold Internal Medicine Board certification. [1] ¶ 75. Defendant has an overwhelming portion of the market. From this market share, the Court can infer that the Internal Medicine Board has the power to create a monopoly.

In the face of these allegations, Defendant responds that it does not have that purported monopoly power for three reasons: 1) there is no barrier for another certifying body to enter the market; 2) Plaintiffs make no allegations about Defendant's control of the market's total output; and 3) Plaintiffs do not allege the Internal Medicine Board is charging higher rates.

To start, Plaintiffs need not plead a barrier that prevents another competitor from entering the market. To survive this motion to dismiss, Plaintiffs must only plead sufficient facts for the Court to infer that the Internal Medicine Board has enough market power to create a monopoly. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). They have done so here through allegations that the Internal Medicine Board can exclude competition, and by alleging its vast market share. While barriers to market entry may serve as further indicia that a defendant's market share translates to monopoly power, it does not follow that the Osteopathic organizations and physicians needed to include every possible means of demonstrating monopoly power in their Complaint.

Defendant's other arguments about its lack of monopoly power are also unpersuasive. According to the Complaint, the Internal Medicine Board reduces output by limiting who may sit for its board certification exams. It has constrained who may become board-certified in internal medicine. Plaintiffs also argue that the Osteopathic Board cannot increase its own certification output because the attestation requirement excludes it from competition on the merits. Based on the Internal Medicine Board's dominant share of the market, the Court can reasonably infer Defendant has the power to restrict the market's output.

As for Defendant's price argument, Plaintiffs do not need to allege that Defendant both restricted output and raised prices. *CoStar Group, Inc. v. Com. Real Estate Exch., Inc.*, 150 F.4th 1056, 1070 (9th Cir. 2025). Nevertheless, the Court can reasonably infer that the Internal Medicine Board could have done so. The power to control price is inextricably entwined with the power to control competition. *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956). Physicians generally need board certification for medical staff privileges at hospitals and health care organizations. [1] ¶ 42. If the Internal Medicine Board becomes the only organization offering this certification for internists, it could easily command higher prices for that product. The monopoly power would allow it to raise prices when it so chooses. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 850 (6th Cir. 1979).

15

Based on their allegations of direct and indirect evidence, Plaintiffs have sufficiently demonstrated that Defendant has monopoly power by alleging they have been excluded from competition on the merits and through Defendant's dominant market share.

## B.  Willful Acquisition and Maintenance

Monopoly power alone does not give rise to a Section 2 violation. Instead, Plaintiffs must also demonstrate that Defendant willfully acquired or maintained that power through anticompetitive conduct. *Viamedia*, 951 F.3d at 451. This may be shown through pleading predatory or exclusionary conduct, which is conduct that impairs a rival's ability to compete on the merits and thereby injures the competitive process. *Id*. at 452–53. Such conduct has no legitimate business justification other than to damage or destroy competition. *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir. 1986).

At this stage, the Osteopathic organizations and physicians have demonstrated the Internal Medicine Board willfully maintained its monopoly power through anticompetitive conduct. According to the Complaint, the attestation requirement is exclusionary by nature. It excludes Osteopathic-credentialed program directors from attesting to their residents' and fellows' completion of their training programs. [1] ¶ 5. Thus, it has the effect of excluding Osteopathic-credentialed physicians from purportedly valuable program director roles because hospitals desire Internal Medicine Board-certified program directors. *Id*. ¶¶ 56, 65. Osteopathic-certified physicians are, as a result, unable to compete on the merits. As for physicians seeking board certification, fewer residents and fellows want to become Osteopathic-certified because they are now more likely to be trained by Internal Medicine Board-certified program directors. *Id*. ¶ 96. Further, these physicians do not wish to become Osteopathic-certified because it hinders their own career aspirations. *Id*. ¶ 78. In short, the Complaint sufficiently alleges that the attestation requirement harms competition from Defendant's only meaningful competitor, which diminishes the competitive process.

According to Plaintiffs, there is no legitimate justification for the attestation requirement. The Internal Medicine Board certifying exam and the Osteopathic certifying exam are both rigorous and comprehensive. *Id*. ¶ 52. The Osteopathic organizations and physicians claim that program directors credentialed by either body have extensive training, practice, and licensure. *Id*. ¶ 72. From these allegations, it is plausible that attestation from an Internal Medicine Board-certified program director does not establish that residents and fellows are better prepared or more qualified candidates. Additionally, Plaintiffs allege that candidates may sit for the Internal Medicine Board exams with an attestation from program directors certified by the Royal College of Physicians and Surgeons of Canada or the Collège des Médecins du Québec. *Id*. ¶ 63. This strengthens the inference that the attestation requirement is intended to exclude Osteopathic-certified program directors for non-meritorious reasons.

Thus, viewing the inferences in Plaintiffs' favor, they have plausibly alleged that Defendant willfully acquired and maintained its monopoly power through exclusionary and unjustifiable conduct. Defendant's motion to dismiss Count IV is denied.

16

### V.     Rule 12(c) Motion

Defendant also moves under Rule 12(c) for a judgment on the pleadings, arguing that Plaintiff American Osteopathic Association is barred from bringing these claims because of a settlement reached in another case. The motion is premature. A Rule 12(c) motion may be brought "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c). The pleadings include the complaint and the answer. *Federated Mutual Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312 (7th Cir. 2020). That means the earliest time to move for judgment on the pleadings is normally after the answer is filed. *Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006). Defendant has not yet filed an answer in this action, so the Court therefore denies Defendant's 12(c) motion as premature.

### Conclusion

For the reasons stated above, Defendant's motion to dismiss [26] [27][9] is granted in part and denied in part. Counts I, II, and III are dismissed without prejudice. Plaintiffs have not alleged an agreement to restrain trade or a group boycott. Plaintiffs also fail to put forth facts demonstrating Defendant had a separate economic interest in an unwanted tied product for their tying claim. Count IV, which plausibly alleges a Section 2 monopoly claim, may proceed because Defendant purportedly has monopoly power and has willfully acquired that power through anticompetitive means, with no business justification.

**SO ORDERED.**

Dated: July 20, 2026

Sunil R. Harjani
United States District Judge

---

[9] Defendant filed part of its motion and an exhibit under seal. The Court has not referenced the sealed material in this memorandum opinion and order.